Dwight Dwayne ADANANDUS, Appellant,

v.

The STATE of Texas, Appellee.

No. 70897.

Court of Criminal Appeals of Texas.

June 16, 1993.

Rehearing Denied Sept. 22, 1993.

Julie B. Pollock, San Antonio, for appellant.

John F. Carroll, Dist. Atty., Pro Tem, San Antonio, Robert Huttash, State's Atty., Austin, for the State.

OPINION

MALONEY, Judge.

Appellant was convicted of murder in the course of committing a robbery. TEX.PENAL CODE ANN. § 19.03(a)(2). The jury affirmatively answered the special issues submitted. TEX.CODE CRIM.PROC.ANN. art. 37.071(b). Appeal to this court is automatic. TEX.CODE CRIM.PROC.ANN. art. 37.071(h).

In point of error forty appellant claims "the trial court erred in denying [his] motion for acquittal based on insufficient evidence to prove the death of the victim was intentional." A discussion of the facts is necessary in order to address this and the other points of error alleging insufficiency of the evidence. On January 28, 1988, appellant entered the lobby of the Continental National Bank in San Antonio, approached Patricia Martinez, a teller, and gave her a hand-written note which said:

1. First of all, this is a robbery! If you "anything" [sic] other than this note ask [sic]; you'll be the first to lose your life! O.K.? I'm for real.

2. Put all the big bill [sic] from your cash tray in the brown folder $100, 50, 20, 10, & 5's. Return note and bag to me in that order!

3. Close your position and excuse yourself to the rear without speaking a word about this until you know that I am no longer here.

Martinez testified that while she was filling appellant's folder with cash, appellant repeatedly threatened to kill her if she identified him. Martinez further testified that appellant put his hand to his pants as if he were reaching for a gun. In removing the cash from her drawer, Martinez activated the bank's lobby cameras. As appellant walked away from Martinez' station with the cash, she pointed to appellant and shouted that he had robbed her. Vernon Hanan, a customer who had just entered the bank, heard the outcry and tackled appellant. Appellant dropped the folder containing the cash, the holdup note and some other papers. The two men wrestled out of the lobby doors and into the bank foyer. Hanan fell to the floor and appellant shot him, causing Hanan's death. Appellant re-entered the bank lobby to retrieve the money and papers, pointing his gun at another customer on his way out. Fleeing the bank, appellant ran into a suburban neighborhood and took refuge under a house. He was apprehended by the police

and Federal Bureau of Investigation (F.B.I.) agents approximately four hours later.

The standard of review for a challenge to sufficiency of the evidence is whether, when viewed in the light most favorable to the verdict, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Dunn v. State,* 819 S.W.2d 510, 513 (Tex.Crim.App.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 105, 121 L.Ed.2d 63 (1992). Intent to kill may be inferred from the use of a deadly weapon in a deadly manner. *Godsey v. State,* 719 S.W.2d 578, 580–81 (Tex.Crim.App.1986). Further, "[i]f a deadly weapon is used in a deadly manner, the inference is almost conclusive that [the defendant] intended to kill...." *Id.* at 581.

The evidence shows that appellant used a deadly weapon in a deadly manner. He entered the bank carrying a loaded gun and made verbal and written threats on the life of a bank employee in order to carry out his plan. When Hanan, an unarmed customer, attempted to thwart appellant's escape, appellant pulled his gun and shot Hanan after Hanan had fallen to the ground.[1] The bullet went through the deceased's right arm and entered his chest. Appellant also pointed his gun at another customer on his way out of the bank. We hold that any rational trier of fact could have found the evidence sufficient to support a finding that appellant acted intentionally in causing the death of Hanan. *See Turner v. State,* 805 S.W.2d 423, 427 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991); *Godsey,* 719 S.W.2d at 580. The trial court did not err in overruling appellant's motion for acquittal. Point of error forty is overruled.

In point of error forty-one appellant claims the evidence is insufficient to support the jury's affirmative answer to special issue number one, "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with

1. Although there was conflicting testimony as to the position of the parties when the gun was fired, the testimony that it was fired after the deceased had fallen to the ground is "most favorable to the verdict."

the reasonable expectation that the death of the deceased or another would result". TEX. CODE CRIM.PROC.ANN. art. 37.071(b)(1). Appellant argues that because the shooting took place during a physical struggle, it was accidental and therefore not deliberate.

In reviewing the evidence in a light most favorable to the verdict we ask whether a rational trier of fact could have found beyond a reasonable doubt that appellant acted deliberately and with the expectation that death would result from his actions. *Westley v. State,* 754 S.W.2d 224, 229 (Tex.Crim.App. 1988), *cert. denied,* 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989). Evidence that the defendant arrived at the scene of the crime carrying a loaded weapon is probative of deliberate conduct. *Carter v. State,* 717 S.W.2d 60, 67 (Tex.Crim.App.1986), *cert. denied,* 484 U.S. 970, 108 S.Ct. 467, 98 L.Ed.2d 407 (1987). Further, evidence of a struggle does not necessarily negate deliberate conduct. *Turner,* 805 S.W.2d at 428.

As discussed in connection with the previous point of error, appellant entered the bank with a loaded gun and made verbal and written threats on the life of a bank employee. Appellant planned his actions with forethought, having entered the bank with a written note outlining his demands and the implications for failing to comply therewith. There was testimony that appellant shot the deceased after the deceased had fallen to the ground and appellant was standing over him. In addition, the State's firearms expert testified that appellant's gun had a heavy trigger pull and was fired from approximately two feet from the deceased. Instead of fleeing immediately after firing, appellant returned to the lobby of the bank to retrieve his papers and the money, wielding his gun at another bank customer on his way out. Evidence was admitted at punishment that appellant was experienced in using firearms— appellant had shot an unarmed man in the head during an altercation with the man's brother over a basketball game, appellant had a prior conviction for unlawfully carrying a handgun, appellant was convicted of burglary of a building and for two separate aggravated robberies of convenience stores, and appellant had committed an aggravated robbery of a savings institution involving facts similar to the instant case. Based on the foregoing evidence, we hold that any rational trier of fact could have found beyond a reasonable doubt that appellant acted deliberately in killing the deceased. *See, e.g., Rousseau v. State,* 855 S.W.2d 666, 684 (Tex. Crim.App.1993), *reh'g denied* (April 7, 1993); *Fuller v. State,* 827 S.W.2d 919 (Tex.Crim. App.1992), *cert. denied; Turner,* 805 S.W.2d at 428–29; *Carter,* 717 S.W.2d at 67; *Smith v. State,* 676 S.W.2d 379, 393 (Tex.Crim.App. 1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2173, 85 L.Ed.2d 490 (1985). Point of error forty-one is overruled.

In his forty-second point of error, appellant claims the evidence is insufficient to support the jury's affirmative answer to special issue number three, "whether the conduct of [appellant] in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." TEX.CODE CRIM. PROC.ANN. art. 37.071(b)(3). Appellant points to Hanan's attempt to stop appellant from exiting the bank as evidence of provocation justifying appellant's use of deadly force against Hanan.

Efforts to apprehend a would-be robber or prevent the completion of a robbery do not amount to provocation for purposes of the third special issue. *See, e.g., Rousseau,* 855 S.W.2d at 684–85; *Westley,* 754 S.W.2d at 230; *Smith,* 676 S.W.2d at 393–94. Hanan was unarmed and tackled appellant in an attempt to abort a robbery. Point of error forty-two is overruled. *See, e.g., Rousseau,* 855 S.W.2d at 684–85; *Turner,* 805 S.W.2d at 428; *Westley,* 754 S.W.2d at 230–31.

In his first five points of error, appellant claims that continued voir dire of the jury panel in his absence violated his rights under Article 1, § 10 of the Texas Constitution, the Sixth Amendment to the Constitution of the United States, and TEX.CODE CRIM.PROC.ANN. art. 33.03. Appellant argues that the right of the accused to be present at voir dire is "unwaivable", citing *Miller v. State,* 692 S.W.2d 88 (Tex.Crim.App.1985). The State contends that error, if any, was harmless.

During voir dire defense counsel informed the court that appellant was feeling ill and did not know if he would be feeling well enough to attend proceedings the next day. Appellant agreed to the continuation of voir dire in his absence. The next day defense counsel informed the court that appellant was still not feeling well and had decided to remain in his cell. Counsel reaffirmed appellant's desire to voluntarily waive his presence. Eight persons were voir dired that day in appellant's absence. Three of those were successfully challenged for cause by the defense. The other five were accepted by both parties as "potential" jurors (peremptories were to be saved and utilized at the conclusion of all of the individual voir dire). The following day the State informed the court that it had come to its attention that appellant's absence the previous day was in violation of article 33.03 of the Code of Criminal Procedure.[2] After considerable debate, the court decided to recall the eight venirepersons for re-examination in appellant's presence. Subsequently, a second voir dire was conducted on the eight venirepersons. Although the questions asked at the second voir dire were generally in confirmation of the testimony given at the first voir dire and were brief, both parties were given the opportunity to fully voir dire each of the eight venirepersons in appellant's presence. The end result was the same as before—the same three venirepersons were challenged for cause by appellant and the others were accepted by both sides as potentials. At the end of all of the voir dire, the State exercised peremptory challenges against the five remaining of the eight venirepersons, so that none of the persons that had been questioned in appellant's absence actually served.

Article 33.03 provides that a defendant must be present during trial and may not voluntarily absent himself until after voir dire. We hold that the article 33.03 was satisfied here. Appellant's absence for part of the voir dire examination was essentially "undone" due to re-examination in appellant's presence of the eight venirepersons that had been voir dired in his absence. Because appellant was provided the opportunity to fully voir dire in his presence each of the venirepersons who were previously voir dired in his absence, the purposes of the statute were met and no error occurred. Moreover, appellant did not utilize any peremptories on these venirepersons and none of these persons served on the jury.[3] Points of error one, two, three, four and five are overruled.

In points of error six, seven, eight and nine, appellant claims the trial court erred by conducting pre-trial proceedings in his absence, in violation of article 28.01 of the Code of Criminal Procedure, Article I, sections 10 and 19 of the Texas Constitution and the Sixth Amendment to the United States Constitution.

Prior to voir dire[4] an in-chambers meeting was held in appellant's absence between the trial judge, the prosecutor and defense counsel.[5] At the meeting, defense counsel complained of videotaping by a television station of venirepersons as they walked into the courtroom:

---

2. Article 33.03, Presence of Defendant, provides in relevant part:

In all prosecutions for felonies, the defendant must be personally present at the trial, and he must likewise be present in all cases of misdemeanor when the punishment or any part thereof is imprisonment in jail; provided, however, that in all cases, when the defendant voluntarily absents himself after pleading to the indictment or information, or after the jury has been selected when trial is before a jury, the trial may proceed to its conclusion.

Tex.Code Crim.Proc.Ann. art. 33.03. In *Miller v. State*, 692 S.W.2d 88 (Tex.Crim.App.1985) we noted that "[u]nder article 33.03 ... an accused's right to be present at his trial is unwaivable until such a time as the jury 'has been selected.'" *Id.* at 90.

3. We note that appellant does not argue his trial strategy was in any way disrupted by these events.

4. It appears from the record that this meeting took place on the same day and immediately prior to the general voir dire of the first panel.

5. During this meeting appellant's attorney stated for the record that "the Defendant is not present in chambers because I waived his presence." Appellant also complains of a second in-chambers meeting at which he claims he was not present. However, because appellant's absence from that meeting is not apparent from the record, we will not address his claim with respect to that meeting.

I want to bring to the Court's attention, Your Honor, that as the jury was being brought into the courtroom that the cameraman from Channel 12 was outside videotaping the jurors as they walked in and from the angle it looked as though—and based on the representations made by Paul Venema, who was with the cameraman, they were shooting at just their feet, Your Honor, I wish to make a record on this. The cameraman was not more than five to seven feet away from individuals as they walked in.

I believe that this activity on the part of the cameraman will have an adverse effect on this jury panel that will work to the Defendant's prejudice and violate his rights to due process in that this panel, as opposed to any other panel that has been brought into the courthouse previously, within my knowledge, Your Honor, no other panel has ever been videotaped in such a manner; therefore, this panel has already been prejudiced so to speak by the attendant publicity surrounding this case
. . .

Defense counsel moved to strike the panel and also requested the opportunity to make a Bill of Exceptions by calling the cameraman to the stand to testify as to the facts regarding the videotape. The court denied the motion to strike the panel, but granted the request to make a Bill; however, the Bill was never made. Further discussions were had regarding publicity and handling of the media. Defense counsel urged the court to restrict photographing or videotaping of jurors.[6] The court did not make a formal "ruling" on that request, but stated that he did not think "that [he could] control the halls" where the press was congregating. Defense counsel's subsequent request that the court instruct the jurors "not to listen to any newscasts or account of the proceedings, read any report in the newspapers concerning the same ..." was granted. The court then raised the issue of jury shuffle and use of strikes:

Now, let me ask you this. And I don't want—you have the absolute right to go out there, view the people and you have a right at this time to ask me whether you want to shuffle or not. I have the cards ....if you want them shuffled I can shuffle them or also I need to know from you all at this point in time if you are going to go and qualify forty-two and then make your strikes, or if you are going to make your strikes as you go along. Now, it doesn't make any difference to me. I couldn't care less but I need to know at this time.

Defense counsel stated that he needed to confer with co-counsel regarding those issues and the meeting ended.

■ Article 28.01 provides in relevant part that "[t]he defendant must be present at the. arraignment, and *his presence is required during any pre-trial proceeding.*" TEX.CODE CRIM.PROC.ANN. art. 28.01, sec. 1 (emphasis added). We first need to determine whether the in-chambers meeting was a "pre-trial proceeding". The first case to define "proceeding" for purposes of article 28.01 was *Riggall v. State,* 590 S.W.2d 460, 461 (Tex. Crim.App.1979). In *Riggall,* the defendant complained that an order issued by the court in his absence violated article 28.01. We noted that "Article 28.01 does not speak to hearings alone but mandates the appearance of a defendant at 'any pre-trial proceedings'." *Id.* The order at issue in *Riggall* overruled the defendant's motion to dismiss, stated that it was heard on a specified day and recited findings of fact and conclusions of law. We said that these recitations indicated that there had been some proceeding at which the court had made its conclusions and held that the defendant should have been present at that proceeding under article 28.01. *Id.* By contrast, in *Malcom v. State,* 628 S.W.2d 790 (Tex.Crim.App.1982), we held that no "proceeding" had taken place where the defendant's motion was not overruled by a written order indicating the existence of some type of proceeding leading to the court's conclusions,

---

**6.** Several days prior to this meeting, appellant had filed a pro se *Motion to Restrict Pretrial Publicity,* in which he asked the court to restrict the media from taking photographs of appellant or other persons connected with the trial. Defense counsel did not specifically refer to this motion in the meeting.

but was merely overruled by a notation on the docket sheet. *Id.* at 792.

The meeting at issue was transcribed by the court reporter and made a part of the statement of facts. The meeting entailed a motion by the defense which was overruled, a request by the defense to make a Bill of Exceptions, which was granted, instructions by the trial court regarding jury shuffle procedures and the use of strikes and some general discussion regarding publicity. We hold the meeting was a "pre-trial proceeding" within the meaning of article 28.01 and therefore the trial court erred in conducting the meeting in appellant's absence. *See Riggall,* 590 S.W.2d at 461. The next issue to be addressed is whether the error was "harmless". TEX.R.APP.P. 81(b)(2).

■ Prior to the enactment of Rule 81(b)(2), we held that where the presence of the defendant does not bear "a reasonably substantial relationship to the opportunity to defend" no harm is shown by his absence. *Cooper v. State,* 631 S.W.2d 508, 512 (Tex. Crim.App.1982); *Mares v. State,* 571 S.W.2d 303, 307 (Tex.Crim.App.1978).[7] This "reasonably substantial relationship" rule derives from the standard recognized as satisfying due process by the United States Supreme Court:

> We assume in aid of the petitioner that in a prosecution for a felony the defendant has the privilege under the Fourteenth Amendment to be present in his own person *whenever his presence has a relation, reasonably substantial, to the fulness [sic] of his opportunity to defend against the charge.*
>
> \* \* \* \* \* \*
>
> So far as the Fourteenth Amendment is concerned, the presence of the defendant is a condition of due process to the extent that a fair and just hearing would be

thwarted by his absence and to that extent only.

*Snyder v. Massachusetts,* 291 U.S. 97, 105–108, 54 S.Ct. 330, 332–333, 78 L.Ed. 674 (1934), *overruled on other grounds, Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (emphasis added). Federal courts have also applied this standard to hold that the absence of the defendant from certain proceedings does not violate the Sixth Amendment. *Egger v. United States,* 509 F.2d 745 (9th Cir.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 61 (1975) (defendant's absence from side-bar conferences in violation of federal rule was harmless because his presence did not bear a reasonably substantial relationship to his opportunity to defend).

The reasonably substantial relationship test is essentially a harm analysis, although it differs from Rule 81(b)(2). We recently recognized that the application of a harm analysis to statutes which appear to impose "mandatory" provisions should be undertaken with caution. *Marin v. State,* 851 S.W.2d 275, 280 (Tex.Crim.App.1993), *reh'g denied* (April 14, 1993). However, we did not hold that every violation of a "mandatory" statute calls for reversal. Rather, each such violation should be considered individually, keeping in mind that "... the harmless error doctrine is broadly consistent with a rule-governed system of adjudication *only when it does not threaten to undermine the very precepts which distinctly specify the fair operation of that system.*" *Id.* (emphasis added). Given that the reasonably substantial relationship test satisfies Due Process and Sixth Amendment concerns, we hold that the application of that test to the absence of the defendant from pretrial proceedings as required by article 28.01, would not endanger the fair operation of the system. Because the reasonably substantial relationship test predated Rule 81(b)(2), the issue arises as to whether or not it has been replaced by Rule 81(b)(2). The reasonably substantial relationship test seeks

---

7. Both *Mares* and *Cooper* involved violations of TEX.CODE CRIM.PROC.ANN. art. 33.03, *Presence of Defendant,* which requires the defendant's presence "at the trial". In *Mares,* the defendant complained of three in-chambers meetings that took place in his absence during the trial and in *Cooper,* the defendant complained of his absence during initial general admonishments given by court to the jury immediately after selection. Although *Mares* and *Cooper* involved violations of article 33.03, we see no reason why the rationale applied there, to the defendant's presence "at the trial" would not be applicable to violations of article 28.01, requiring the defendant's presence "during any pre-trial proceedings".

to determine the effect of the defendant's absence on the advancement of his defense, as opposed to Rule 81(b)(2) which seeks to determine the effect of the defendant's absence on the outcome of the trial or punishment proceeding. In light of the distinct focus of the two tests, we hold that Rule 81(b)(2) does not supplant the reasonably substantial relationship test, but rather should be applied in addition thereto.

 Appellant was zealously represented by counsel at the in-chambers meeting. Defense counsel's arguments regarding the videotaping of the venirepersons and other publicity issues were well-articulated and consistent with appellant's previously filed motion to restrict publicity.[8] Appellant's assistance was not needed in order to further his defense on the issues discussed. Although defense counsel did not obtain a favorable ruling on his motion to strike the panel due to the videotaping, he sought and was granted the opportunity to make a Bill of Exceptions. No decisions were made by appellant's attorney regarding jury shuffle or the use of strikes and no other matters of substance were discussed. We cannot envision how appellant's presence could have furthered his defense. The personal insight of appellant was not required in order for the court to make a ruling on the issues raised. Appellant's pro se motion raised all of his concerns regarding publicity which his counsel might have failed to address. There is no evidence that appellant had any information, not available to the attorneys or the court, regarding any of the matters discussed at the meeting. Because appellant's presence did not bear a "reasonably substantial relationship to the opportunity to defend", no harm or prejudice was shown as a result of his absence. *See Cooper,* supra; *Mares,* supra. Further, the jurors were affected by the discussions that took place during the meeting only to the extent that the trial court later admonished them regarding publicity, which appellant had requested in his previous motion. The trial court did not abuse its discretion in overruling defense counsel's motion to strike

the panel. There is no evidence that the trial court might have ruled differently during the meeting had appellant been present and a supposition of that nature is unreasonable. We conclude beyond a reasonable doubt that appellant's absence from the meeting made no contribution to his conviction or punishment. Points of error six, seven, eight and nine are overruled.

 In points of error ten, eleven, and twelve, appellant contends the trial court erred in denying his challenges for cause to venireperson Jordan due to his bias against the law upon which appellant relied. TEX. CODE CRIM.PROC.ANN. art. 35.16(c)(2). To present reversible error in the trial court's erroneous denial of a challenge for cause, the appellant must show (1) he exhausted all of his peremptory challenges, (2) the trial court denied his request for additional peremptory challenges, and (3) a venireperson upon whom he would have exercised a peremptory challenge was seated on the jury. *Harris v. State,* 790 S.W.2d 568, 581 (Tex.Crim.App. 1989); *Demouchette v. State,* 731 S.W.2d 75, 83 (Tex.Crim.App.1986), *cert. denied,* 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987); *Bell v. State,* 724 S.W.2d 780, 795 (Tex.Crim.App.1986), *cert. denied,* 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). Because appellant has met this burden, we will address the merits of his claims.[9]

In point of error ten, appellant contends venireperson Jordan could not distinguish between the terms "intentionally" and "deliberately." In point of error eleven, appellant contends Jordan believed if an armed person enters a building intending to commit a robbery, any killing committed in the course of that robbery is necessarily an intentional killing, thereby lessening the State's burden of proof.

Although initially appearing to perceive a difference in meaning between "intentionally" and "deliberately" when defense counsel asked Jordan about the terms, Jordan later expressed confusion as to the difference in

8. Fn. 6, infra.

9. After appellant exhausted his fifteen peremptory challenges, the trial court granted his request for an additional one. After using the additional one, appellant again requested more peremptory challenges and that request was denied.

meaning and as to the State's burden to prove an intentional killing. The following exchange occurred between defense counsel and venireperson Jordan:

Q. So, if you found that a person committed a Capital Murder, because he intentionally kills somebody while committing a robbery, then you feel like you have no other choice but to find that he deliberately did that, and that the answer to that question should be, yes?

A. I would have to say yes.

Q. Let me talk to you about something else that you mentioned there. That is, you said that if somebody went into someplace with a gun and armed and he uses a gun, that would mean to you that he was intentionally doing it?

A. What I said, if somebody went in on a robbery, is armed, his intention when he walks in the door, before there is a shooting, as far as I'm concerned, his intentions were to use it, that's why I'm taking it in.

Q. So, any killing that would take place, you would necessarily find is an intentional killing under those circumstances?

A. Under those circumstances, I would find, there is robbery, and armed robbery, why would he go in with a gun unless he intended to use it.

Defense counsel challenged venireperson Jordan for cause based on Jordan's "automatic answer to the first special issue upon [a] finding of guilty of Capital Murder," and Jordan's "statement that any time that a person committed a robbery and there was a gun in use, [Jordan] would find an intentional killing."

After the State attempted to rehabilitate Jordan, defense counsel again questioned Jordan on the difference between "intentionally" and "deliberately." Jordan again indicated that he would affirmatively answer the first special issue upon a finding that the killing was intentional. Appellant renewed his challenge for cause "with respect to [venireperson Jordan's] automatic answer as to Special Issue Number 1." The trial court denied that challenge because Jordan did not state that he would "always automatically" answer the first special issue affirmatively.

After defense counsel and the State questioned Jordan on that issue, the court asked Jordan some questions. Upon questioning by the court, Jordan stated he would not always or automatically answer the first special issue affirmatively after finding a killing was intentional, and he stated he would follow the law. Defense counsel further questioned Jordan whereupon he stated he could conceive of a situation when a person intentionally killed someone but the answer to the first special issue would be no. Defense counsel asked for a ruling on the challenge for cause to Jordan's automatic answer to the first special issue, the trial court denied it, and defense counsel inquired about Jordan's thoughts on intentional killings. The following exchange occurred between defense counsel and venireperson Jordan:

Q. So, Mr. Jordan, what you have told us is that your it is your belief that if a person goes to commit a robbery and carries a gun in with him and a shooting takes place and a person is killed in the course of that robbery, that, to you, is enough to find that that killing was an intentional killing; is that right?

A. Intentional, the way I see it, yes.

Q. You don't need to determine for yourself that there was a conscious objective or desire to kill a person at the moment that the shooting took place, but it's enough that he went there to that robbery with a gun?

A. What I stated was, a while ago, if he went in, somebody went in with a gun he's already made his mind up if he has to use it, he will use it, so if that's intentional, well, then it's intentional.

\* \* \* \* \* \*

A. What I said is, anybody that goes in has said to himself if I have to, I'll use it. And usually that means killing somebody in an armed robbery, because they don't want witnesses. If he has that intention before he goes in, its intentional to me, is what I'm saying.

Q. If there is a killing?

A. Yeah, if there is a killing, there was an intentional killing. It was an armed robbery.

Defense counsel challenged Jordan for cause based on Jordan's belief that in an armed robbery any killing is necessarily intentional; a belief which lessens the State's burden of proof.

The State subsequently rehabilitated Jordan. The State explained the law to Jordan and Jordan stated he had previously been asked for his opinion and he recognized a difference between his opinion and the law. Thereafter, when questioned by defense counsel, Jordan stated he could set aside his personal views and follow the law:

Q. Now, yes. I did always ask you the question in terms of what your believe [sic] was. That's right. So, you were quite accurately responding to my questions only in terms of what your believe [sic] is. And not in terms of what the law is. Now, it is the law that you—but is that brain of yours so such or so strong that you cannot set it aside and follow the law?

A. I don't see why I couldn't. In my opinion, it's only one persons [sic] opinion in any matter. I don't see where I would take it upon myself to change something that I didn't set.

Q. Now, that we understand what your beliefs and opinions are on the one hand and what the law requires on the other hand, can you give us assurance that—can you assure us that if you are selected to serve on this jury that you will set aside that personal belief or opinion of yours and that you will require or follow the law before you will find that an individual's guilty of Capital Murder under circumstances that we presented to you?

A. I assure you that I will do what I am requested to do by the Court and I'm sworn to. .

\* \* \* \* \* \*

Q. \* \* \* Is that opinion that you have, that we have stated, is that going to influence the way that you evaluate the evidence in this case if you are chosen as a juror?

A. I don't believe so.

The trial court denied appellant's challenge for cause to Jordan on his view that any killing in an armed robbery is necessarily intentional.

The grant or denial of a challenge for cause is within the discretion of the trial court, and this Court will not disturb the trial court's decision absent an abuse of that discretion. *See Mooney v. State,* 817 S.W.2d 693, 701 (Tex.Crim.App.1991). When a venireperson vacillates on the question of his or her ability to answer special issues under TEX.CODE CRIM.PROC.ANN. art. 37.071(b), this Court defers to the findings of the trial court. *Green v. State,* 840 S.W.2d 394, 405 (Tex. Crim.App.1992) (citing *Perillo v. State,* 758 S.W.2d 567, 576–77 (Tex.Crim.App.1988)), *cert. denied,* —— U.S. ——, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993). If a venireperson ultimately states that he can follow the court's instructions and render a verdict according to the evidence, that venireperson is not challengeable for cause, even if he originally equivocated on his answers. *See Holland v. State,* 761 S.W.2d 307, 318 (Tex.Crim. App.1988), *cert. denied,* 489 U.S. 1091, 109 S.Ct. 1560, 103 L.Ed.2d 863 (1989).

Venireperson Jordan was a vacillating venireperson; initially, he maintained that a guilty verdict at the guilt-innocence phase of trial would require an affirmative answer to the first special issue, but then he conceded that a guilty verdict would not necessarily dictate an affirmative answer to the first special issue. Similarly, Jordan originally indicated he would always find a killing in an armed robbery to be intentional, but later he acknowledged the law recognizes a killing in that situation is not necessarily intentional and he stated that he could follow the law. "Such a record 'presents an adequate basis to support the trial court's ruling *either* that the venireman was challengeable for cause ... *or that [he] was not.*'" *Green,* 840 S.W.2d at 406 (quoting *Perillo,* 758 S.W.2d at 577) (emphasis in the original). Thus, we cannot say the trial court abused its discretion in denying appellant's first two challenges for cause to venireperson Jordan. Points of error ten and eleven are overruled.

In point of error twelve, appellant contends venireperson Jordan could not consider the full range of punishment for the lesser-included offense of murder. *See, e.g., Pierce*

*v. State*, 696 S.W.2d 899, 901–02 (Tex.Crim. App.1985) (capital murder conviction was reversed because venireperson would not consider probation for murder). Defense counsel asked Jordan whether he could consider five years imprisonment for someone found guilty of murder. Jordan initially said he did not know, but when pressed for an answer he said no. Appellant challenged Jordan for cause apparently due to his failure to consider the full range of punishment for murder. However, when subsequently questioned by both the State and defense counsel, Jordan stated that he could consider the full range of punishment for murder, including a minimum of five years imprisonment. He explained that when defense counsel first asked the question he thought he was asked to consider five years as a maximum penalty for murder, rather than a minimum. Unlike the venireperson in *Pierce*, venireperson Jordan could consider the full range of punishment for the lesser-included offense of murder; therefore, we hold that the trial court did not abuse its discretion in denying appellant's third challenge for cause to venireperson Jordan. *See Williams v. State*, 773 S.W.2d 525, 535–37 (Tex.Crim.App.1988), *cert. denied*, 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 207 (1989). Point of error twelve is overruled.

In point of error thirteen, appellant contends the trial court erred in denying his challenge for cause to venireperson Cano due to his inability to distinguish between "intentionally" and "deliberately." We will not address the merits of this contention because after the trial court denied his challenge for cause, appellant did not exercise a peremptory challenge on venireperson Cano although he still had three peremptory challenges left. *Harris*, 790 S.W.2d at 581. Point of error thirteen is overruled.

In point of error fourteen, appellant contends the trial court erred in overruling appellant's objection to the State's hypothetical which misstated the difference between "intentionally" and "deliberately." Appellant contends use of the erroneous hypothetical rendered venireperson McDaniel challengea-

ble for cause. *Martinez v. State*, 763 S.W.2d 413, 425 (Tex.Crim.App.1988). After his challenges for cause were denied, appellant exercised a peremptory challenge on McDaniel. The record reflects, however, that appellant did not challenge McDaniel for cause on the basis of the State's hypothetical, but only on her alleged bias against appellant's right not to testify and the presumption of innocence. Therefore, we will not address the merits of this point of error. *See Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Crim.App. 1990); Tex.R.App.P. 52(a). Point of error fourteen is overruled.

In points of error fifteen through eighteen, appellant contends the State exercised a peremptory challenge against venireperson King in violation of federal and state law. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); Tex. Const. art. I, §§ 3a & 19; Tex.Code Crim.Proc.Ann. arts. 1.04 & 35.261. After appellant objected to the State's use of a peremptory challenge against venireperson King as racially motivated, the trial court conducted a *Batson* hearing in which the prosecutor testified as to his race neutral reasons for exercising a peremptory challenge on her. The trial court found the State did not exercise the peremptory challenge on the basis of her race, and therefore denied appellant's request to dismiss the array and call a new venire panel.

Because the State proffered race neutral reasons for its peremptory challenge to venireperson King, and the trial court ruled on the issue of purposeful racial discrimination, we need not address whether appellant established a prima facie case.[10] *Hill v. State*, 827 S.W.2d 860, 865 (Tex.Crim. App.), *cert. denied*, — U.S. —, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992). Nevertheless, the State must present legitimate racially neutral explanations for the peremptory challenge to venireperson King, and appellant has the burden of persuasion to establish purposeful racial discrimination. *Lewis v. State*, 815 S.W.2d 560, 563–64 (Tex.Crim.App. 1991), *cert. denied*, — U.S. —, 112 S.Ct.

---

**10.** Three African–Americans were on the venire panel, two were successfully challenged for cause, leaving only venireperson King. Because the State excluded from the jury the only quali-

fied African–American when it struck venireperson King, a prima facie case of purposeful racial discrimination was shown. *See Salazar v. State*, 795 S.W.2d 187, 193 (Tex.Crim.App.1990).

1296, 117 L.Ed.2d 519 (1992); TEX.CODE CRIM.PROC.ANN. art. 35.261(a).

■■■■ We review the record of the *Batson* hearing and the voir dire examination in the light most favorable to the trial court's ruling. *Cantu v. State*, 842 S.W.2d 667, 689 (Tex.Crim.App.), *cert. denied; Harris v. State*, 827 S.W.2d 949, 955 (Tex.Crim.App. 1992); *Williams v. State*, 804 S.W.2d 95, 101 (Tex.Crim.App.), *cert. denied*, — U.S. —, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991). We will not disturb a trial court's ruling on a *Batson* issue unless it is clearly erroneous. *Cantu*, 842 S.W.2d at 689; *Harris*, 827 S.W.2d at 955; *Whitsey v. State*, 796 S.W.2d 707, 726 (Tex.Crim.App.1990) (op. on reh'g).

■■■ A review of venireperson King's voir dire examination reveals she had sixty hours in psychology, her father is a San Antonio police officer, and her cousin is a criminal district judge in Houston who had worked in the Harris County district attorney's office before she became a judge. Venireperson King perceived a difference between "intentionally" and "deliberately," and she wouldn't hold the State to a higher burden of proof than beyond a reasonable doubt.

In answer to a question on the juror questionnaire which asked, Do you believe there should be a Death Penalty?, venireperson King wrote "Unsure, because I feel that what facts are given through the media is [sic] unjust and facts are important." She testified she believed there should be a death penalty for offenses "done out of spite, unjustly or just because." Another question on the juror questionnaire asked her to rank revenge, deterrence, and rehabilitation in order of their proper role of punishment. Instead of ranking them, venireperson King only checked rehabilitation, and then wrote, "Most crimes that are committed are done at a moments [sic] notice which means there was no clear thought of what was going on during the crime." When asked whether deterrence played any part in punishment, she said, "A little bit more than in the middle."

The prosecutor testified at the *Batson* hearing that he peremptorily challenged venireperson King because she appeared unwilling to assess the death penalty. The prosecutor testified that he viewed venireperson King's answers as vague and unsure concerning the death penalty, and he felt that she would not answer the special issues affirmatively in this case given her view that rehabilitation is the goal of punishment. He further testified that the State was more trustful of answers given on the juror questionnaire than those during voir dire since the answers given on the questionnaire were without any courtroom influence. He also peremptorily challenged her because on the last day of the voir dire examination she arrived at the courthouse one and one-half hours late via a Bexar county sheriff escort.[11] The latter reason concerned the prosecutor because he feared "disharmony" among the jurors if they had to be seated with a juror who was late and delayed the voir dire. The prosecutor further testified that he "didn't want anybody on the jury that had any extensive training in psychology." On cross-examination, the prosecutor admitted the other venirepersons were not aware of venireperson King's tardiness, she was not the only venireperson who arrived late, and he did not peremptorily challenge the other tardy venirepersons. He explained venireperson King was the only tardy venireperson who had to be brought to the courthouse in custody. He also testified that he put the word "black" in parentheses next to venireperson King's name on his handwritten notes of the voir dire examination.

■■■ In his brief, appellant argues the State did not peremptorily challenge other similarly situated venirepersons, "clearly disparate treatment by the State." Specifically, appellant contends the State did not peremptorily challenge the three other tardy venirepersons or venireperson Guevara who vacillated on his views on the death penalty. " 'Disparate treatment,' as such, cannot automatically be imputed in every situation where one of the State's reasons for striking

11. When venireperson King did not appear, as told, at the courthouse at 8:00 a.m. that morning, someone from the Bexar county sheriff's office eventually went to her home and brought her to the courthouse.

a venireperson would technically apply to another venireperson whom the State found acceptable." *Cantu,* 842 S.W.2d at 689 (citations omitted). The prosecutor testified venireperson King was the only tardy person brought to the courthouse in custody. On his juror questionnaire, venireperson Guevara originally answered no to the question asking whether he believed in the death penalty, but then scratched it out and answered yes. The prosecutor testified that although he may have originally thought venireperson Guevara was uncertain about the death penalty, he "cleared that up in my own mind." He further testified while venireperson King stated she could assess the death penalty in certain cases, the prosecutor did not feel she would assess it in this particular case. "Where, as here, the State has offered numerous race neutral reasons for its challenge, we cannot say that the fact that there were other acceptable jurors possessing one or more of these objectionable attributes, is sufficient to establish disparate treatment." *Id.* Because we cannot conclude the trial court's ruling that the State excused venireperson King for race neutral reasons was clearly erroneous, points of error fifteen through eighteen are overruled.

■ In point of error nineteen, appellant contends the trial court erred in overruling his running objection to the State's definition of "intentionally" and "knowingly" to nine venirepersons. Appellant contends the State defined the terms in relation to the nature of the conduct, rather than the result of the conduct. *See Martinez,* 763 S.W.2d at 419

(capital murder is a result of conduct offense).

Appellant's complaint is without merit. A review of the voir dire examination reveals although the State defined "intentionally" in the broader terms of section 6.03 of the penal code;[12] defense counsel cross-examined each venireperson on the meaning of "intentionally" and "knowingly" only in relation to the result of the conduct. Further, in the court's charge to the jury, the trial court defined "intentionally" and "knowingly" only in terms of the result of the conduct.[13] Any error in the State's earlier definition was therefore harmless. Point of error nineteen is overruled.

■ In points of error twenty, twenty-one and twenty-two, appellant claims the trial court erred in admitting at punishment the testimony of three San Antonio police officers as to appellant's bad reputation for being peaceful and law abiding. Appellant argues that because the officers' knowledge of appellant's reputation in the community was limited to their knowledge of specific criminal acts and based upon their discussions with other police officers, they were not qualified to give testimony as to appellant's reputation in the community. Appellant cites *Wagner v. State,* 687 S.W.2d 303, 313 (Tex.Crim.App. 1985) in support of his claims.

■ Rule of Criminal Evidence 404(c) provides that evidence of the accused's character may be offered by either party at the punishment phase. At the time of appellant's trial, Rule of Criminal Evidence 405(a) provided that character may be proven through reputation or opinion testimony.[14]

---

12. Section 6.03(a) of the penal code provides:

> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

TEX.PENAL CODE ANN. § 6.03(a).

13. The trial court defined "intentionally" and "knowingly" as follows:

> A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.
> A person acts knowingly, or with knowledge, with respect to a result of his conduct when he

is aware that his conduct is reasonably certain to cause the result.

14. Rule 405(a) provided as follows:

> In all cases in which evidence of character or trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. Provided however that in order to be competent to testify concerning the character or trait of character of the accused, a witness must, prior to the date of the offense, have been substantially familiar with the reputation of the accused.

TEX.R.CRIM.EVID. 405(a) (West 1988). This rule was amended in 1990, one notable revision being the deletion of the word "substantially".

We have recognized that "[a] reputation witness's testimony must be based on discussions with others concerning the defendant, or on hearing others discuss the defendant's reputation, and not just on personal knowledge.... Discussions with other police officers are sufficient to qualify a witness on reputation." *Turner v. State,* 805 S.W.2d 423, 429 (Tex.Crim.App.) (citations omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991).

In *Wagner,* cited by appellant, the police officer who testified as to the defendant's reputation had known the defendant for only two months. *Wagner,* 687 S.W.2d at 312. The officer's testimony was based solely upon a single discussion with a man who alleged that the defendant had threatened his life and his wife's life. The man's wife had previously been engaged to the defendant. *Id.* Holding that the officer did not qualify as a reputation witness, we said that his "testimony could not possibly constitute the kind of synthesis of observation and discussion in the community which is the basis for deeming reputation testimony reliable. His testimony was not indicative of the climate of opinion in the community. Rather, it reflected a single unproven allegation made by an obviously biased third party." *Id.* at 314.

▮ Here, the three police officers each testified that appellant's reputation in the community for being peaceful and law-abiding was bad. Prior to testifying, each of the three officers were taken on voir dire where it was established that their conclusions regarding appellant's reputation were based upon discussions with other police officers regarding various criminal activities of appellant and their own investigations of appel-

lant's criminal activities, including discussions with members of the community during the course of those investigations. In contrast to the officer's testimony in *Wagner,* the testimony of the officers in this case was based upon at least ten years of contact with appellant. The officers had repeatedly discussed appellant with other officers and with members of the community. Appellant was also discussed by the officers in connection with the police department's repeat offenders program which focused on the continuing criminal activity of parolees. Although the officers testified that they did not specifically ask anyone about appellant's "reputation", it is not necessary that such a question be asked so long as the witness' testimony is based upon a "synthesis of [ ] observations and discussions which results in a conclusion as to the individual's reputation." *Id.* at 313. In light of the length of time the officers' had known appellant and their numerous discussions with other officers and others in the community regarding appellant and his activities, we hold the trial court did not abuse its discretion in admitting their testimony. *Turner,* supra.[15] Points of error twenty, twenty-one and twenty-two are overruled.

▮ In points of error twenty-three through twenty-nine, appellant contends the jury instructions at the punishment phase failed to provide the jury a means in which to consider mitigating evidence and that the trial court erred in denying his requested jury instructions concerning mitigating evidence. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

The only mitigating evidence presented at trial was during the punishment phase of

---

**15.** We note that even if it had been error to admit the testimony, any error would have been harmless. The State spent two days putting on its punishment evidence, calling twenty-one witnesses to testify. In addition to the testimony of the three officers at issue, the State offered testimony that appellant was arrested for possession of marijuana, testimony that appellant was convicted for burglary of a building, unlawfully carrying a firearm and aggravated robbery of a convenience store, testimony that appellant committed an aggravated robbery of Sunbelt Savings in Hurst, Texas, under facts similar to the instant case, evidence that appellant had prior convictions for passing forged instruments and theft

and testimony that appellant shot a man in the head during an altercation and was convicted of assault causing bodily injury for that offense. Many of the State's witnesses were victims of appellant's extraneous offenses who testified in detail to the facts of those offenses. The testimony of the three officers was diminutive in comparison to the rest of the State's case at punishment. Of the 509 pages of the statement of facts devoted to the State's case at punishment, only thirty-six pages include the testimony of the officers at issue. Further, the State did not mention the testimony of the three officers or make any statements regarding appellant's bad reputation in its closing arguments.

trial, when appellant testified that he was remorseful and "unhappy" that he had caused the deceased's death. However, evidence of remorse is not the kind of mitigating evidence requiring a *Penry* -type instruction. *Ex parte Jacobs,* 843 S.W.2d 517, 520 (Tex.Crim.App.1992), *pet. for cert. filed,* Feb. 2, 1993; *Ex parte Harris,* 825 S.W.2d 120, 121–22 (Tex.Crim.App.1991); *Boyd v. State,* 811 S.W.2d 105, 111–12 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 112 S.Ct. 448, 116 L.Ed.2d 466 (1991). Points of error twenty-three through twenty-nine are overruled.

In point of error thirty, appellant contends the trial court erred in denying the second part of his requested definition of "deliberately" in the jury charge at the punishment phase of trial. The trial court granted the first part of appellant's requested definition. This Court has consistently held that the trial court does not have to define the term "deliberately" in the jury charge, and we decline to reconsider our precedents here. *E.g., Cantu,* 842 S.W.2d at 691; *Fearance v. State,* 771 S.W.2d 486, 513 (Tex.Crim.App. 1988), *cert. denied,* 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989); *Morin v. State,* 682 S.W.2d 265, 270 (Tex.Crim.App. 1983); *King v. State,* 553 S.W.2d 105, 107 (Tex.Crim.App.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978). Point of error thirty is overruled.

In point of error thirty-one appellant claims the trial court erred in denying appellant's motion for a mistrial after the State questioned a witness regarding an extraneous offense.

Appellant called a former employee of the Continental National Bank to testify at guilt-innocence regarding the facts of the instant offense. On cross-examination the State asked the following question of the witness:

> [Prosecutor:] I believe you had, a month or so earlier, had called the police out for something, didn't you, there at the bank, a couple of Black men there around the bank—

Appellant interrupted and asked to approach the bench, where he objected to the question as soliciting extraneous offense evidence.

The State agreed and withdrew the question. Appellant asked the State whether or not there was any evidence that appellant was one of the men referred to in its question, to which the prosecutor responded that he did not think the witness could identify appellant as one of the men. Appellant's subsequent request for an instruction to disregard was granted, but his motion for a mistrial was denied. Appellant claims the court's instruction to disregard the State's question was insufficient and he should have been granted a mistrial.

"The asking an improper question, by itself, will seldom call for a mistrial." *Hernandez v. State,* 805 S.W.2d 409, 413 (Tex.Crim.App.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991). A mistrial is in order only "when the question is 'clearly calculated to inflame the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced on their minds.'" *Id.* (quoting *Gonzales v. State,* 685 S.W.2d 47, 49 (Tex.Crim.App.1985)). The State's question here was not of the nature of questions which call for a mistrial. The question did not directly implicate appellant, referring only to "a couple of Black men". Because of appellant's timely interruption, the question revealed very little in terms of the facts regarding the extraneous conduct and the witness had no opportunity to respond. The trial court's instruction to disregard was sufficient to cure the error. Point of error thirty-one is overruled.

In point of error thirty-two appellant claims the trial court erred in denying his request to call William Stolhandske as a witness.

At guilt-innocence appellant called Stolhandske as a witness. Out of the presence of the jury it was determined that Stolhandske had represented the deceased's family in a wrongful death action against the Continental National Bank. The State objected that Stolhandske's testimony was not relevant. Appellant argued that evidence of the Bank's civil liability was relevant to the issue of intent.[16] The court denied appellant's re-

---

**16.** At trial appellant articulated his argument on this issue as follows:

quest to call Stolhandske, but appellant was allowed to make a bill of exceptions. In making appellant's bill, Stolhandske testified that he had represented the deceased's family in filing a wrongful death action against the bank and that a settlement was reached "that included certain compensation concessions". The terms of the settlement agreement and judgment were confidential. Stolhandske further testified that one of the allegations made in the civil suit was that the "bank was negligent for failing to provide proper training to the teller".

We have recognized that "it is a fundamental element of due process of law that an accused has the right to present his own witnesses to establish a defense." *Hardin v. State,* 471 S.W.2d 60, 62 (Tex.Crim.App. 1971); *see also Ex parte Scarbrough,* 604 S.W.2d 170, 174 (Tex.Crim.App.1980). However, only relevant evidence is admissible, TEX.R.CRIM.EVID. 401, 402, and even relevant evidence made be excluded if "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, or needless presentation of cumulative evidence." TEX.R.CRIM. EVID. 403.

We hold the trial court did not abuse its discretion in denying appellant's request to call Stolhandske as a witness. According to appellant's Bill, Stolhandske would have testified that the deceased's family had filed a civil lawsuit against the bank, based in part upon allegations that the teller had not been properly trained, and that the bank had entered into a settlement agreement, the terms of which were confidential. The lawsuit filed by the deceased's family was based upon the civil theory of negligence; however, theories of "contributory negligence" or "comparative negligence" are not applicable in the context of determining guilt or innocence on a criminal charge of capital murder. Appellant does not claim the evidence raised an issue of transferred intent or concurrent causation. Evidence demonstrating that the deceased's family was compensated in a civil lawsuit based upon theories of civil negligence as related to the teller's conduct has no bearing on the issue of whether or not appellant acted intentionally in shooting the deceased. In other words, evidence that the teller acted negligently pursuant to civil standards and a civil burden of proof, does not have "any tendency to make [appellant's allegedly intentional conduct] more probable or less probable than it would be without the evidence." Point of error thirty-two is overruled.

In points of error thirty-three, thirty-four and thirty-five, appellant claims the trial court erred in admitting State's Exhibits 132, 133, and 134, photographs of law enforcement officers engaged in the apprehension of appellant following the instant offense. Appellant claims these photographs are irrelevant and highly prejudicial. The State points out that the photographs depict matters that were testified to without objection and that improper admission of evidence is not reversible error if that same evidence is otherwise introduced without objection.

After committing the instant offense, appellant fled to a nearby residential neighborhood. Following a four hour search involving local police, F.B.I. agents and trained dogs, appellant was apprehended underneath

... it's going to be the argument of the defense and the theory of the defense that intervening causes occurred in this situation, one of those intervening causes was that the bank teller yelled out "Stop him, stop him," and "He just robbed me, stop him."

The State—excuse me, the defense basically contends had that not occurred, we would probably not be sitting today in the courtroom ... that perhaps there was no intentionality of conduct because this was something that occurred as result [sic] of other individuals.

\* \* \* \* \* \*

The reason that the issue of the settlement [of the civil suit] is important is that it's an ac-knowledgment by other individuals, so to speak, that there is some small way the conduct of the teller is partly responsible—why is that important? Because it can make a difference between a knowing killing, that is, the jury finding that he knowingly engaged in conduct reasonably certain to cause the result rather than intentionality of conduct, intentionality of causing the result which is what they have to do and we're fighting on this man's life, Judge....

a house. Prior to the introduction of the complained of photographs several police officers testified to the details of appellant's apprehension. The officers testified to the numbers of law enforcement agents employed, the presence of k–9 agents with their dogs, F.B.I. agents, and members of the SWAT Unit and the tactical procedures employed by the SWAT Unit and the equipment used, including bullet-proof shields, vests and helmets. This testimony was admitted without objection to its relevancy.

The complained of photographs were taken at the scene where appellant was apprehended. Exhibit 132 was described at trial as depicting "one of the members of our SWAT team in a tactical position." The SWAT team member, dressed in combat clothing, appears kneeling behind an automobile. Exhibit 133 depicts two officers and a dog outside the garage next to the house where appellant was apprehended. Exhibit 134 depicts two F.B.I. SWAT team members running beside a patrol car at the scene.

We hold the trial court did not err in admitting the photographs, as it was "within the zone of reasonable disagreement" to conclude that they were probative and relevant to the State's case. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990). Evidence of appellant's flight from the scene and the circumstances of his apprehension bear upon the issue of appellant's guilt. Moreover, in light of the prior admission, without objection, of substantively the same evidence in the form of verbal testimony, the photographs were not prejudicial. *Cf. Long v. State*, 823 S.W.2d 259, 270–73 (Tex.Crim.App.1991). Points of error thirty-three, thirty-four and thirty-five are overruled.

■ In point of error thirty-six appellant claims the trial court erred in denying his requested charge on voluntary conduct at guilt-innocence. Appellant argues that a charge on voluntary conduct should have been given because the evidence raised the issue of accident.

Accident is not a defense under the Texas Penal Code. *Williams v. State*, 630 S.W.2d 640, 644 (Tex.Crim.App.1982). Although previously a defense, it is now encompassed by TEX.PENAL CODE ANN. § 6.01(a) which provides that "[a] person commits an offense only if he voluntarily engages in conduct...." *Id.* As we stated in *Williams:*

> If the issue is raised by the evidence, a jury may be charged that a defendant should be acquitted if there is a reasonable doubt as to whether he voluntarily engaged in the *conduct* of which he is accused.

630 S.W.2d at 644 (emphasis in original).

■ Our opinion in *George v. State*, 681 S.W.2d 43 (Tex.Crim.App.1984) is helpful in determining whether the evidence here raised the issue of involuntary conduct on the part of appellant. Following is a recitation of the facts in *George:*

> On the late afternoon of a March day, thirteen year old Leonard Marin was visiting younger brothers of appellant in the home of appellant and other members of his family. Appellant was then seventeen. All present were friends. Standing in front of seated Martin, appellant demanded a dollar from him; when the latter verbally refused to produce it appellant drew a .22 caliber revolver from a pocket, thumbed its hammer partially back and, pointing it at Martin's face, told Martin to "give me the dollar;"[ ] the gun discharged, its bullet striking Martin in the left maxilla of his face, crossing the frenulum of the nose and traveling under the skin until it came out from the right frontal area of his face. Appellant threw the gun aside, striking a brother in the chest; he went with Martin to the home of a neighbor to seek aid, but they were denied. At another house, however, an ambulance was summoned.[ ]

*Id.* at 44. At his trial for assault the defendant testified that " 'the hammer slipped off my thumb' and the gun 'went off' ". The defendant further testified that he did not mean for the gun to go off and that "he did not intend to shoot Martin or harm him in any way—it was an accident." *Id.* The defendant's request for a charge on the defense of involuntary conduct was denied. Holding that the trial court was correct in refusing to give a charge on the defense of

involuntary conduct, we said the evidence did not show that the defendant's bodily movements [17] in applying pressure to the hammer of the gun were "involuntary":

> Here the evidence shows that appellant's actions were sufficiently voluntary until 'the hammer [of the handgun he was holding slipped off [his] thumb,' but the court of appeals then turned its focus to the handgun, finding that *it* discharged 'involuntarily or by accident.' We cannot accept that a mechanical object is capable of volition, and if the court meant to say that appellant was not at that moment doing an 'act,' we do not agree. If the hammer 'slipped off [his] thumb,' it had to be that the thumb holding the hammer partially back released just enough pressure for the hammer to 'slip' forward. However slight, that is 'bodily movement' within the meaning of § 1.07(a)(1), and there is no evidence that it was involuntary.

*Id.* at 47. We further said that "conduct [is not] rendered involuntary merely because an accused does not intend the result of his conduct." *Id.* at 46 (citations omitted). Therefore, the issue of the voluntariness of one's conduct, or bodily movements, is separate from the issue of one's mental state.

In the instant case, the fact that appellant struggled with the deceased prior to the shooting does not amount to evidence that the act of shooting the deceased was involuntary conduct. There is no evidence that appellant and the deceased struggled over the gun or that the deceased ever had his hand on the gun, nor is there any evidence that appellant's actions in aiming the gun and pulling the trigger were involuntary. There is no evidence that the gun was involuntarily discharged. The fact that appellant did not initially intend to engage in a struggle with a customer does not render his conduct in doing so involuntary or any of his bodily movements during that encounter involuntary. *See George,* supra. Even if, as appellant

contends, the gun "went off" as he was stumbling backwards, there is no evidence that the gun fired on its own volition. *See id.* Point of error thirty-six is overruled.

In point of error thirty-seven appellant claims the trial court erred in refusing to give his requested charge on the lesser included offense of felony murder.

■■■■ A two-prong test must be satisfied before a defendant is entitled to a charge on a lesser included offense:

> first, the lesser included offense must be included within the proof necessary to establish the offense charged, and, second, some evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense.

*Rousseau,* 855 S.W.2d at 673. Further, "[i]n applying the two-prong test[ ], the trial court should make a determination as to whether the evidence of the lesser offense would be sufficient for a jury rationally to find that the defendant is guilty only of that offense, and not the greater offense." *Id.*

■■■■ Because felony murder is a lesser included offense of capital murder, appellant has satisfied the first prong of the test. *See id.* at 673 ("the only difference between the two offenses is the culpable mental state of the offender.... Capital murder requires the existence of an 'intentional cause of death,' ..., while in felony murder, 'the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying ... felony....'"). Under the second prong, appellant was entitled to a charge if there was *some* evidence that appellant had the intent to commit the robbery, but not the murder. Appellant argues that the evidence "reveals that [he] only had the intent to rob" and not the intent to kill. However, review of the evidence does not support appellant's position.[18] The evidence shows that as appellant was leaving the bank

---

17. We premised our analysis in *George* upon a review of the applicable Penal Code definitions. "Conduct" is defined as "an act or omission and its accompanying mental state" and "act" is defined as "a bodily movement, whether voluntary or involuntary, and includes speech." TEX.PENAL CODE ANN. §§ 1.07(a)(8), 1.07(a)(1).

18. Because the videotape and still pictures entered into evidence at trial were not made a part of the record on appeal, our discussion of the evidence is based upon the testimony of witnesses.

after having robbed the teller, he was tackled by the deceased. A struggle ensued. There is no evidence that the parties were at any point struggling over the gun. More than one witness testified that appellant shot the deceased after the deceased had fallen to the ground. One witness testified that appellant "was in an upright position and he pointed the gun at [the deceased] while [the deceased] was laying down on the floor and shot him." The bullet went through the right arm of the deceased, re-entered his body at his chest and went through his breast bone and heart. The medical examiner testified that "[t]here was no evidence of close-range firing on the skin at the time. There was no powder or no soot on the wound entrance." We conclude there is *no* evidence upon which a jury could rationally find that appellant had the intent to rob, but not the intent to cause the death of the deceased. Accordingly, appellant was not entitled to a charge on the lesser included offense of felony murder.[19] Point of error thirty-seven is overruled.

In his thirty-eighth point of error appellant claims the trial court erred in refusing his requested charge on the lesser included offense of voluntary manslaughter. Appellant argues in his brief that the following evidence entitled him to a charge on voluntary manslaughter:

The appellant in this case was attempting to leave the bank after the robbery, the teller started screaming, she threw a sign hitting him in the back, appellant looked "mad," the victim grabbed appellant and started struggling, the gun went off—all of this occurring in a matter of seconds.

▮▮▮▮ A charge on voluntary manslaughter is appropriate when there is evidence that the defendant caused the death under the "immediate influence of sudden passion arising from adequate cause." Tex.Penal Code Ann. § 19.04(a).[20] The "sudden passion" must be "directly caused by and arising out of provocation by the individual killed or another acting with the person killed...." Tex.Penal Code Ann. § 19.-04(b). However, where the defendant initiates the criminal episode which leads to the victim's death and the victim was acting in an attempt to prevent the commission of the felony by the defendant, the victim's actions will not be viewed as constituting adequate cause from which sudden passion may arise for purposes of voluntary manslaughter. *See Vuong v. State*, 830 S.W.2d 929, 939 (Tex. Crim.App.1992), *cert. denied*, — U.S. —, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992) (when defendant initiates violent criminal episode, victim's subsequent acts of violence do not constitute adequate cause for purposes of warranting instruction on voluntary manslaughter); *Harris v. State*, 784 S.W.2d 5, 10

19. Appellant does not point to any specific evidence in support of his claim, but asserts that the evidence as set forth in his brief's General Statement of Facts supports his claim. We cannot glean from appellant's General Statement of Facts which evidence he relies upon to demonstrate that he did not have the intent to cause the death of the deceased. However, among the evidence discussed in the General Statement of Facts, the statements of several witnesses that the struggle between appellant and the deceased "all happened very quickly" seem to be highlighted. Perhaps appellant contends that he somehow never formulated the requisite intent to commit the murder during the struggle with the deceased because "it all happened very quickly". As we said in *Rousseau:*

The possibility that initially or at some point during the commission of the robbery the offender did not have an intent to cause death does not amount to evidence that the offender did not intend to cause the victim's death when the murder was committed. There is no requirement in the case of capital murder committed in the course of a robbery, that the intent to cause death be premeditated or formulated prior to the commission of the robbery. The offender must only have formulated an intent to cause death when he actually commits the murder.

*Rousseau*, 855 S.W.2d at 674. The evidence shows that at some point during the struggle, appellant aimed his gun at the deceased and fired. The fact that the struggled occurred quickly does not amount to evidence that appellant did not have the intent to cause the death of the deceased at the moment he aimed his gun and fired.

20. Voluntary manslaughter is defined as follows:

A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

Tex.Penal Code Ann. § 19.04(a).

(Tex.Crim.App.1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990) (deceased's actions in shooting defendant in an attempt to prevent kidnapping did not amount to adequate for purposes of raising issue of voluntary manslaughter); *see also Lincecum v. State,* 736 S.W.2d 673 (Tex. Crim.App.1987), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 936 (1988) (victim's actions in stabbing defendant in self-defense and defense of child did not amount to adequate cause for purposes of voluntary manslaughter). Point of error thirty-eight is overruled.

In point of error thirty-nine appellant claims the trial court erred in refusing his requested charge on the lesser offense of involuntary manslaughter.

 A charge on the lesser offense of involuntary manslaughter should have been given if there is some evidence that would permit a jury rationally to find that appellant recklessly caused the death of the deceased, but not intentionally.[21] Tex.Penal Code Ann. § 19.05 (person commits involuntary manslaughter if he recklessly causes the death of an individual); *see Rousseau,* supra. "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tex.Penal Code Ann.

§ 6.03(c). There is no evidence in the record from which a rational jury could infer that appellant's actions were merely reckless and were *not* intentional. Appellant did not testify to his mental state nor was there any evidence offered which indicated that appellant was guilty only of consciously disregarding a substantial and unjustifiable risk in aiming at and shooting the deceased. *Compare Salinas v. State,* 644 S.W.2d 744, 746 (Tex.Crim.App.1983) (recklessness raised where defendant testified that he was not aiming the gun and did not intend to shoot when the gun discharged accidentally) *with Tompkins v. State,* 774 S.W.2d 195, 212 (Tex. Crim.App.1987), *aff'd,* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989) (issue of involuntary manslaughter not raised where "appellant did not testify or offer any evidence that he caused his victim's death by a reckless act").[22] Point of error thirty-nine is overruled.[23]

In point of error forty-three appellant claims the trial court erred in allowing the State to introduce at punishment evidence of unadjudicated extraneous offenses, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Appellant argues that evidence of unadjudicated offenses is "inherently unreliable" and points to other states which limit the introduction of unadjudicated offenses as aggravating evidence at the sentencing stage of capital trials.[24]

---

**21.** Involuntary manslaughter may be a lesser included offense of murder and consequently of capital murder. *See Tompkins v. State,* 774 S.W.2d 195, 211 (Tex.Crim.App.1987).

**22.** Although the issue of a lesser included offense is often raised by the testimony or confession of the defendant, evidence from any source may raise the issue.

**23.** In points of error thirty-seven, thirty-eight and thirty-nine, appellant cites *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), in support of his claims that he was entitled a charge on a lesser included offense. We reject appellant's argument on the same grounds that a similar claim was rejected in *Tompkins:*

> [In *Beck* ] the Supreme Court held that where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction of the alleged offense, thus requiring that the jury be

given the option of convicting the defendant of some lesser included offense. Although we do not disagree with what the Supreme Court stated in the above cases, we find that *Beck,* supra, is factually distinguishable from the instant case. In *Beck,* supra, the defendant testified at trial and denied that he killed his victim or intended his victim's death or intended his victim's death, whereas here appellant did not testify or present any evidence from any source that he possessed only the intent to either rob or kidnap [the victim].

In the instant case, there is no evidence in the record that would permit a jury rationally to find that appellant was guilty only of one of the lesser included offenses of felony murder, voluntary manslaughter or involuntary manslaughter.

**24.** Appellant also contends that the unreliability factor was heightened by the fact that he did not receive prior notice of the offenses to be introduced. He raises this issue again separately in point of error forty-four, where we will address it.

Article 37.071 of the Code of Criminal Procedure provides that evidence may be presented at the punishment phase of a capital murder trial "as to any matter the court deems relevant to sentencing". We have held on numerous occasions that "[a]bsent a showing of unfair surprise, evidence of unadjudicated offenses are admissible at the sentencing stage in a capital case" and such admission does not violate due process. *Kinnamon v. State*, 791 S.W.2d 84, 93 (Tex.Crim. App.1990) (citations omitted). Further, the admissibility of unadjudicated extraneous offenses under article 37.071 does not violate the Eighth Amendment, because the State retains the burden to prove the special issues beyond a reasonable doubt. *Cf. Cantu*, 842 S.W.2d at 692 (State need not prove elements of extraneous offenses beyond a reasonable doubt because article 37.071 prohibits imposition of death penalty unless State proves special issues beyond reasonable doubt). The trial court did not abuse its discretion in concluding that the introduction of the unadjudicated offenses of which appellant here complains—robbery, unauthorized use of a motor vehicle and burglary of a habitation— were not "relevant to sentencing". Point of error forty-three is overruled.

In his forty-fourth point of error appellant claims the State's failure to give reasonable notice of the unadjudicated extraneous offenses to be admitted at punishment violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article 1, section 19 of the Texas Constitution. Appellant further claims that requiring the defendant to demonstrate unfair surprise is an unconstitutional shifting of the burden of proof. In point of error forty-seven, appellant claims the introduction of unadjudicated extraneous offense evidence at the punishment phase of trial without notice to appellant violated Rule of Criminal Evidence 404(b).

Appellant filed a pretrial motion entitled Motion to Exclude Unadjudicated Extraneous Offenses at Punishment Phase of Trial, in which he claimed that because unadjudicated offenses are inadmissible in noncapital trials, it is violative of due process and equal protection to permit such evidence in capital trials. This motion was denied. Appellant also filed a Motion for Discovery and Inspection in which he sought to have the court order the State to give specific written description of the extraneous offenses it intended to introduce. The court granted this request, but only as to extraneous offenses offered at guilt-innocence. During punishment, appellant made no objection to or claim of surprise at the introduction of evidence of the unadjudicated offenses of which he now complains.

It is well-settled that "absent a showing of unfair surprise, proof of unadjudicated, extraneous offenses at the punishment stage of a capital case is admissible." *Guerra v. State*, 771 S.W.2d 453, 461 (Tex.Crim. App.), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3260, 106 L.Ed.2d 606 (1988). The fact that the trial court did not grant appellant's request for specific notice as to the punishment phase of trial does not amount to evidence that appellant was "unfairly surprised" at the introduction of such evidence at punishment. In the absence of any objection or claim of surprise at the time the evidence was introduced, or any other evidence demonstrating unfair surprise, the trial court did not err in permitting the evidence. We have previously rejected the argument that to require the defendant bear the burden of showing unfair surprise is a violation of due process or equal protection. *Hogue v. State*, 711 S.W.2d 9, 29 (Tex.Crim.App.1986), *cert. denied*, 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986) (citing *Williams v. State*, 622 S.W.2d 116 (Tex.Crim.App.1981)). Further, with respect to point of error forty-seven, Rule 404(b) does not govern the admissibility of character evidence at the punishment stage of a capital trial. *Vuong*, 830 S.W.2d at 942. The appropriate governing provision is Rule of Criminal Evidence 404(c), which does not contain a notice provision. *Id.* Points of error forty-four and forty-seven are overruled.

In point of error forty-five appellant claims the trial court erred in refusing his requested instruction at punishment regarding the burden of proof on unadjudicated offenses, in violation of the Eighth and Fourteenth Amendments to the United States Constitu-

**234**

tion. Appellant points to other states which require the jury to find that aggravating factors are proven beyond a reasonable doubt and argues that the jury should be given guidance as to the manner in which they are to consider such evidence.

 Appellant requested that the jury be instructed that they could not consider extraneous offense evidence unless they first found beyond a reasonable doubt that appellant had committed the extraneous offense. However, such a requirement is contrary to existing caselaw. The State need not prove beyond a reasonable doubt that appellant committed the extraneous offenses admitted at punishment. *Ramirez v. State*, 815 S.W.2d 636, 652–53 (Tex.Crim.App.1991); *Spence v. State*, 795 S.W.2d 743, 759 (Tex. Crim.App.1990), *cert. denied*, 499 U.S. 932, 111 S.Ct. 1339, 113 L.Ed.2d 271 (1991). Rejecting a claim substantively similar to the claim made by appellant here, we said:

> [Article 37.071] disallows the imposition of death unless the jury finds, beyond a reasonable doubt, sufficient evidence of deliberateness, future dangerousness, and, if applicable, provocation. By circumscribing the conditions under which an individual can be sentenced to death, Article 37.071 provides the precise narrowing function contemplated by the above-cited cases. Consequently, we reject appellant's contention that the admission of unadjudicated offenses at the punishment phase of his capital trial was violative of the federal constitution.

*Cantu v. State*, 842 S.W.2d at 692 (citations omitted). Point of error forty-five is overruled.

 In point of error forty-six appellant claims the admission of unadjudicated extraneous offenses in capital sentencing hearings, while such evidence is inadmissible in noncapital trials, is violative of his rights under the Eighth Amendment and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. We have previously addressed and rejected such claims. *Harris*, 827 S.W.2d at 961–62 (evidence of unadjudicated extraneous offenses at punishment in capital trial does not violate

due process or equal protection). Point of error forty-six is overruled.

The judgment of the trial court is affirmed.

OVERSTREET, J., not participating.